**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota, | Hennepin County, Fourth Judicial District Court File No. 27-CR-26-12537 |
| Plaintiff, | Case No. ________ |
| v. | **NOTICE OF REMOVAL OF STATE CRIMINAL PROSECUTION PURSUANT TO 28 U.S.C. §§ 1442 and 1455** |
| Christian J. Castro, | |
| Defendant. | |

**NOTICE OF REMOVAL OF STATE CRIMINAL PROSECUTION & REQUEST FOR EVIDENTIARY HEARING**

Defendant Christian J. Castro, a former Deportation Officer with United States Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE/ERO"), through counsel, and pursuant to 28 U.S.C. §§ 1442 and 1455, files this Notice of Removal of State Criminal Prosecution ("Notice") to remove the case of *State v. Christian J. Castro*, Case No. 27-CR-26-12537, from the Hennepin County District Court, Fourth Judicial District, to the United States District Court for the District of Minnesota.

This Notice is filed on October 16, 2026. Officer Castro had arranged to voluntarily surrender to authorities on September 17, 2026, in Minnesota by agreement between Officer Castro's counsel, Daniel Gerdts, and the arresting authorities. However, authorities instead executed an arrest and Officer Castro was released on bond. Defendant has not yet been arraigned in the State court, and no trial has been set. This Notice is

therefore timely under 28 U.S.C. § 1455(b)(1), which permits removal "not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier."

On January 14, 2026, while on duty during Operation Metro Surge, Officer Castro attempted to stop and arrest a man the State identifies as "Victim 2" for violation of federal immigration law. Victim 2 surmised that the pursuing officers were ICE agents and fled — first by car, then on foot. Officer Castro pursued alone, caught Victim 2 in the front yard of a duplex on 24th Avenue North in Minneapolis, and struggled with him on the icy ground. A second man, "Victim 1," then physically intervened, pulling Victim 2 away from Officer Castro. By the State's own account, Victim 1 admits that he "swung a broom at the agent," and Victim 2 admits that he grabbed a broom and "held the broom briefly like a baseball bat facing the agent." Both men then broke away and ran into the residence. Within approximately five seconds, Officer Castro — alone, after dark, having just been on the ground with the two men, and with his backup still arriving roughly 100 feet away — rose and a single round from his service weapon was discharged. The State has charged Officer Castro with four counts of Assault in the Second Degree — Dangerous Weapon and one misdemeanor count of Falsely Reporting a Crime based on statements he made to fellow federal officers about the same encounter — the first of them within seconds of the discharge, while the enforcement action was still under way. Because every charge arises from acts under color of his federal office, and he raises the colorable federal defense that his actions were authorized by federal law and necessary

and proper to carry out his federal duties, he is entitled to have his case heard in federal court.

Pursuant to 28 U.S.C. § 1455(a), copies of all process, pleadings, and orders served upon Officer Castro are attached as Exhibits A–J: (A) the Complaint and Warrant filed May 18, 2026; (B) Certificate of Representation; (C) Non-Cash Bond Posted; (D) Order for Conditional Release; (E) Waiver of Extradition Rights Signed in Minnesota; (F) Law Enforcement Notice of Release and Appearance; (G) Pre-Plea Worksheet; (H) Pro Hac Vice Order re Michael Wynne; (I) Pro Hac Vice Order re Jon Muschenheim; (J) Register of Actions. Defendant verifies that, to the best of his knowledge, these constitute all materials served in the state prosecution to date. A copy of the August 26, 2026 Order of the United States District Court for the Southern District of Texas in *Walz v. Abbott*, No. 1:26-cv-906, is attached as Exhibit K; the Court may take judicial notice of it. *See* Fed. R. Evid. 201(b). That order reflects (i) that Officer Castro acted "in the course of his duties as an agent for" ICE; (ii) that ICE leadership ordered him back to Texas on January 15, 2026, as confirmed by DOJ (S.D. Tex. Doc. 21 at 2); and (iii) the Texas arrest/extradition history.

A copy of the Declaration of Field Office Director Patrick Divver, filed by the United States in the same action on August 24, 2026 (S.D. Tex. Doc. 21-1) ("Divver Decl."), is attached as Exhibit L. Defendant annexes the Divver Declaration to this Notice for purposes of 28 U.S.C. § 1455(b)(4), and will seek Touhy permission to present Field Office Director Divver's testimony, or a further declaration/witness related to these facts, if the Court requires an evidentiary hearing under 28 U.S.C. § 1455(b)(5).

## BACKGROUND

### A. Officer Castro

Officer Castro has been employed by U.S. Immigration and Customs Enforcement, a component of the United States Department of Homeland Security ("DHS"), as an ICE/ERO Deportation Officer since approximately September 2025. Before joining ICE, he served for approximately four years as a United States Border Patrol Agent with DHS and eight years as a Customs and Border Protection agent. His duty field office is the ICE/ERO field office in Harlingen, Texas. Divver Decl. ¶ 7. In December 2025, ICE detailed him on temporary duty ("TDY") to the Minneapolis–St. Paul area of Minnesota as part of Operation Metro Surge. He was unambiguously an "officer of the United States or of any agency thereof" within the meaning of 28 U.S.C. § 1442(a)(1).

As an immigration officer, Officer Castro is authorized by Congress, without a warrant, to interrogate any person believed to be an alien as to his right to be or remain in the United States, and to arrest any alien in the United States whom he has reason to believe is in the United States in violation of law and is likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(1)–(2). He is further authorized to make warrantless arrests for any offense against the United States committed in his presence, 8 U.S.C. § 1357(a)(5)(A), and to carry a firearm in the performance of his duties, 8 C.F.R. § 287.5(f). Federal regulations govern his use of force, including deadly force. 8 C.F.R. § 287.8(a).

**B. Operation Metro Surge**

As Operation Metro Surge built up from December 2025 through February 2026, community resistance and hostility toward federal immigration officers in the Twin Cities increased. Citizens organized rapid-response networks. Locals crowdsourced identifying information — such as the makes, models, and license plate numbers of unmarked federal law enforcement vehicles — and shared it across social media and encrypted applications to track ICE movements, warn neighbors, and at times harass, obstruct, threaten, or assault ICE officers. The ICE/ERO official who was one of the Director of Operations for Operation Metro Surge — and who in that role "managed all aspects of ERO's enforcement activities in the operation, including personnel management" — has described these conditions in a declaration the United States filed in federal court: at the time, "there were many protestors following ICE officers and using aggressive and sometimes violent tactics, including doxxing, to interfere with officers carrying out their duties." Divver Decl. ¶¶ 4, 7.

**C. The January 14, 2026 Encounter**

The following account is drawn from the State's own Complaint, its summary of city-camera footage, and the statements of its own witnesses.[1]

---

[1] "It was settled long ago that the federal officer, in order to secure removal, need not admit that he actually committed the charged offenses." *Willingham v. Morgan*, 395 U.S. 402, 408 (1969) (citing *Maryland v. Soper*, 270 U.S. 9, 32–33 (1926)). Except where otherwise noted, the facts recited in this Notice are drawn from the State's own Complaint (Ex. A), including its summary of city-camera video and of the statements of the State's own witnesses, and are recited solely for purposes of removal. Officer Castro does not adopt the State's characterizations, and nothing in this Notice is a statement by Officer Castro regarding the underlying events or a waiver of any right or privilege, including his privilege under the Fifth Amendment. Christian Castro does aver that he

On January 14, 2026, Officer Castro and fellow ICE officers were conducting immigration enforcement operations in Minneapolis. According to another ICE officer interviewed by investigators ("ICE Agent 1"), the officers "ran a background information on somebody and . . . made sure that the person was apprehendable" before initiating the pursuit that followed. Ex. A at 4. The person was Victim 2. By his own account, Victim 2 observed a vehicle pull up next to him, "surmised that they were associated with ICE," and "drove away." *Id.* at 5. Officers pursued Victim 2 through the streets of Minneapolis to a duplex on 24th Avenue North.[2] During the pursuit, Victim 2 called Victim 1 and told him ICE was chasing him and that he was coming home; the residents called 911 and went to the front of the house to wait for him. *Id.* at 4–5.

The State's city-camera footage then shows the following.[3] At 6:47 PM — before any officer arrived — Victim 1 stepped onto the front lawn holding a snow shovel. At 6:48:36 PM, two vehicles stopped approximately 100 feet east of the home. At 6:48:45 PM, Victim 2 emerged from his vehicle and ran toward the home, and Officer Castro emerged from the second vehicle and pursued him on foot, alone. At 6:48:50 PM, Victim 1 tossed the shovel onto the ground. At 6:48:52 PM, Victim 2 slipped on the icy ground before he could reach the front door. At 6:48:55 PM, Officer Castro caught up to Victim

---

subjectively believed his conduct was justified and in furtherance of his duties as a federal agent.

[2] ICE Agent 1 estimated the pursuit at 7–10 minutes; Victim 2 estimated 25 minutes. Ex. A at 4–5. Either way, it is undisputed that Victim 2 surmised that the occupants of the pursuing vehicle were ICE agents and chose to flee rather than stop. *Id.* at 5.

[3] All timestamps are as reported in the Complaint's summary of the city-camera footage and the ShotSpotter report. Ex. A at 3.

2 and struggled with him on the ground. At 6:49:01 PM, Victim 1 approached and reached down, "appearing to separate Victim 2 from [Officer Castro]." At 6:49:04 PM, Victim 1 and Victim 2 ran to the front door. At 6:49:08 PM, Officer Castro got up off the ground, "just as additional ICE vehicles were arriving on 24th Ave. approximately 100 feet east of the home." At 6:49:09 PM, a single round was fired. Ex. A at 3.

The State's own witnesses supply what the camera does not. Victim 1 told investigators that he "intervened by pulling Victim 2 away from the agent," that the agent "attempted to grab Victim 2 again," and that "Victim 1 swung a broom at the agent." Ex. A at 5. Victim 2 told investigators that after he broke free, he stood up and "grab[bed] a broom" and "held the broom briefly like a baseball bat facing the agent." *Id.*[4] Investigators later recovered a shovel from the front yard, a broom from the front step, and a second broom inside the foyer. *Id.* at 6. The entire sequence — from the moment Officer Castro reached Victim 2 to the single shot — lasted approximately fourteen seconds, and the shot came roughly five seconds after the two men broke away and ran for the house. *Id.* at 3.

Immediately afterward, the occupants barricaded themselves inside. *Id.* at 4. Officer Castro's role in the enforcement action did not end there. Within seconds, as the State's own summary of the video reflects, he "stepped back and spoke to an arriving ICE agent." *Id.* at 3. According to that officer, ICE Agent 1, Officer Castro described the

[4] Victim 1 says he did not strike the agent with the broom, and Victim 2 says he did not swing it before throwing it down. Ex. A at 5. For removal purposes, what matters is that, by the State's own evidence, two men physically separated a suspect from a lone federal officer mid-arrest while at least one of them wielded a broom toward the officer — conduct that itself falls within 18 U.S.C. § 111(a).

confrontation with the two men, the shovel, and the broom; said that he did not know whether anyone had been struck; and advised that the occupants "had already shut the doors on us." *Id.* at 4. The team proceeded accordingly: when the occupants refused to exit, ICE officers breached the residence and took the adult occupants into custody. *Id.*

The FBI joined, and then assumed control of, the investigation of the encounter. *Id.* FBI agents interviewed Officer Castro, and on January 16, 2026, an FBI agent swore to an affidavit summarizing his account — identifying him not by name but by his official designation, "ERO #1" — which the United States Attorney's Office filed in this Court in support of federal felony assault charges against Victims 1 and 2. *Id.* at 6–7. The BCA never interviewed Officer Castro. *Id.* at 4. Separately, Officer Castro was examined at Cambridge Medical Center, where he described the encounter to medical personnel. *Id.* at 5–6. Because of the threat posed by protestors, Officer Castro had to be brought to a hospital many miles away from the scene. Divver Decl. ¶ 8.

**D. The State Prosecution**

On May 18, 2026 — more than four months after the incident — the Hennepin County Attorney filed a Complaint charging Officer Castro with four counts of Assault in the Second Degree — Dangerous Weapon, in violation of Minn. Stat. §§ 609.222, subd. 1, and 609.11, subd. 5(a) (Counts I–IV), one count for each adult alleged to have been inside the residence, and one count of Falsely Reporting a Crime, in violation of Minn. Stat. § 609.505, subd. 1 (Count V), based on his accounts of the encounter to federal law

enforcement officers.[5] Ex. A at 1–2. Rather than issue a summons to a sworn federal officer, the State obtained a nationwide warrant with bail set at $200,000. *Id.* at 9.[6]

Officer Castro was no longer in Minnesota when the State filed its Complaint, and not by his own choice. On January 15, 2026 — the day after the incident — ICE leadership ordered him to return to Texas, a fact the United States Department of Justice has confirmed on the record in federal court. *Walz v. Abbott*, No. 1:26-cv-906, slip op. at 3 n.1 (S.D. Tex. Aug. 26, 2026) (Rodriguez, J.) (order denying application for temporary restraining order) (citing Statement of United States, Doc. 21, at 2) (Ex. K). The ICE official who gave that order, Field Office Director Patrick Divver — then serving as ERO Director of Operations for Operation Metro Surge — described it in a declaration the United States filed in that case. Divver Decl. ¶¶ 4–10. Director Divver learned of the use-of-force incident on January 15, 2026, and, after conferring with ERO senior leadership, directed Officer Castro, through his chain of command, to return to his duty field office in Harlingen, Texas. *Id.* ¶¶ 6–7. "DO Castro had no discretion in this matter." *Id.* ¶ 7. The directive was based on concerns for the personal safety of Officer Castro and of other ICE officers in Minnesota, given that protestors were following ICE officers and using

---

[5] The Complaint does not identify which statement, or which recipient, forms the basis of Count V. It describes accounts attributed to Officer Castro given to a fellow ICE officer at the scene, to medical personnel at Cambridge Medical Center, and to FBI agents. Ex. A at 4, 5–7. Medical personnel are not law enforcement officers, and a statement to them cannot support a charge under Minn. Stat. § 609.505, subd. 1. Count V therefore necessarily rests on statements to ICE Agent 1 or the FBI — that is, to federal officers. *See infra* Part I.B.2.

[6] Officer Castro is also the defendant in *United States v. Castro*, No. 0:26-cr-00152-DWF-ECW (D. Minn.), which arises from the same January 14, 2026 events.

aggressive and sometimes violent tactics, including doxxing; Officer Castro's partner, a witness to the incident, was directed home the same day for the same reasons. *Id.* It was Director Divver's general practice during the operation to send TDY officers back to their home offices if they were involved in an incident that had the potential to impact officer or public safety. *Id.* ¶ 8. The ticket for Officer Castro's flight from Minneapolis to Texas, with an ultimate destination of Harlingen, was issued at government expense on January 15, and he traveled on January 16, 2026. *Id.* ¶ 9. When he was ordered to return to Texas, no criminal charges were pending against him. *Id.* ¶ 10. Officer Castro's departure from Minnesota was thus an act of his agency, not a choice of his own. The same day the Complaint was filed, a Hennepin County judge issued a nationwide warrant for Officer Castro's arrest. *Walz*, slip op. at 2.

On May 29, 2026, authorities in Cameron County, Texas arrested Officer Castro on the strength of the Minnesota warrant and booked him into the Cameron County Jail, where the booking report reflected that he was "pending extradition." *Id.* On June 2, 2026, Minnesota Governor Tim Walz formally requested Officer Castro's extradition from Texas Governor Greg Abbott under the Extradition Act, 18 U.S.C. § 3182, and the Uniform Criminal Extradition Act ("UCEA"). *Id.* On June 4, 2026, Officer Castro appeared before a Cameron County judge, who informed him of the extradition request and initially denied bond, later permitting him to post a $200,000 bond. *Id.* Officer Castro did not post bond and did not waive his extradition rights at that time, and he remained in custody in Cameron County while the extradition request remained pending. *Id.*

On August 18, 2026, the State of Minnesota, acting on behalf of Governor Walz and Attorney General Keith Ellison, sued Governor Abbott and Cameron County Sheriff Manuel Trevino in the United States District Court for the Southern District of Texas, seeking a temporary restraining order compelling Governor Abbott to sign a rendition warrant and barring Officer Castro's release from custody. *Id.* at 3–4. At an August 25, 2026 hearing, counsel for Sheriff Trevino represented that, absent a court order or a rendition warrant, Officer Castro would be released on August 27, 2026, at the expiration of the 90-day detention period permitted by Texas law. *Id.* at 4, 8; *see* Tex. Code Crim. Proc. arts. 51.05, 51.07. On August 26, 2026, Judge Fernando Rodriguez, Jr. denied Minnesota's application, concluding that the court lacked subject-matter jurisdiction because the dispute was not ripe. *Walz*, slip op. at 9, 12–13. In all, Officer Castro spent roughly three months in a Texas jail on a Minnesota warrant arising from the performance of his federal duties.

Officer Castro denies the charges and reserves the right to dispute the allegations against him. He asserts that at all relevant times he was acting as a federal officer under color of his office, and that he has a colorable federal defense to the charges: immunity under the Supremacy Clause of the United States Constitution. Accordingly, Officer Castro has the right to have his case heard in federal court.

Because Officer Castro was attempting to effect a federal immigration arrest, was physically resisted and interfered with in the course of that arrest, and intends to raise the defense that his actions were necessary and proper in the performance of his federal duties, he is entitled to have this case heard in federal court. Officer Castro asserts

defenses including but not limited to Supremacy Clause immunity; the authority conferred by 8 U.S.C. § 1357 and its implementing regulations; official-duty self-defense (implicating federal law); official-duty defense of others (implicating federal law); and the federal standards governing an immigration officer's use of force, 8 C.F.R. § 287.8(a), and applicable DHS and ICE use-of-force policy.[7] In the context of the relevant events, several of these defenses are subspecies of the broader immunity defense. The actions of Officer Castro on January 14, 2026, were in performance of acts that federal law authorized him to undertake, and in performing those authorized acts, he did no more than what he reasonably believed was necessary and proper to do.

## I. GROUNDS FOR FEDERAL OFFICER REMOVAL UNDER 28 U.S.C. § 1442

### A. Removal Generally

Congress long ago decided that federal officers should not be subject to prosecution in state court for acts that occurred while they were operating within the scope of their federal employment; the removal statute accomplishes that goal. 28 U.S.C. § 1442(a)(1); *see also Willingham*, 395 U.S. at 407 (removal statute is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law); *Tennessee v. Davis*, 100 U.S. 257, 263 (1880) (discussing the constitutional and policy reasons necessitating removal to federal court). The federal removal statute permits removal of any "criminal prosecution that is commenced in a

[7] Minnesota's statute governing peace-officer use of deadly force, Minn. Stat. § 609.066, and its general self-defense law are not the measure of a federal officer's authority when executing federal law. *See In re Neagle*, 135 U.S. 1, 75 (1890); *Kleinert*, 855 F.3d at 314–16.

State court" against "any officer . . . of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. § 1442(a)(1). The statute "grant[s] district court jurisdiction over cases in which a federal officer is a defendant." *Mesa v. California*, 489 U.S. 121, 136 (1989).

The right of removal under § 1442(a)(1) "is made absolute whenever a suit in a state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406. The statute is to be "liberally construed." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012). And Congress broadened it further in 2011, adding the words "or relating to" so that removal reaches any prosecution "for or relating to" an act under color of federal office. Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545. To qualify for removal, a federal officer must both raise a colorable federal defense and establish that the prosecution is for an act under color of office, which requires a causal connection between the charged conduct and asserted official authority. *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

For removal to be proper, the officer need not prove that his federal defense will be successful, only that it is "colorable." *Acker*, 527 U.S. at 431. The officer need not "win his case before he can have it removed." *Id.* (quoting *Willingham*, 395 U.S. at 407).

And the Court must credit the federal officer's theory of the case when considering whether he has satisfied the jurisdictional elements. *Id.* at 432.

The statute sets out a clear procedure for evaluating a removal notice. This Court must promptly examine the notice, and summary remand is appropriate only if "it clearly appears on the face of the notice and any exhibits annexed thereto" that removal should not be permitted. 28 U.S.C. § 1455(b)(4). If the Court does not order summary remand, "it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require." 28 U.S.C. § 1455(b)(5). If the Court determines that removal shall be permitted, it shall so notify the State court, "which shall proceed no further." *Id.*

Officer Castro requests that this Court find that removal is proper on the face of this Notice and order an evidentiary hearing.

**B. Removal Is Proper**

Removal is proper in this case because Officer Castro was acting "under color of his office"" and has a "colorable" federal defense. *Acker*, 527 U.S. at 431. The reason for removal is to ensure that a federal officer's defense of federal immunity is heard in a federal forum. *Willingham*, 395 U.S. at 407. The three elements for removal are met here.

**1. Officer Castro Is a Federal Officer**

First, Officer Castro is an officer of the United States. There is no dispute that he is a sworn federal law enforcement officer employed by ICE/ERO, a component agency of DHS, and that he was on duty conducting federal immigration enforcement at the time of the incident, January 14, 2026. The State's own Complaint identifies him as "an ICE

agent." Ex. A at 3. *See also Walz*, slip op. at 2 ("ICE agent Castro took part in an enforcement effort in Minnesota"). Officer Castro is an officer of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

**2. Officer Castro Was Acting Under Color of His Office**

Second, Officer Castro was acting "under color of his office." Removal requires only that "his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution." *Soper*, 270 U.S. at 33. That standard is satisfied on the face of the State's own Complaint. Every charged act occurred during — and only because of — Officer Castro's attempt to apprehend Victim 2 under federal immigration law. He was present at the duplex on 24th Avenue North solely because he was pursuing a person whom ICE had identified as "apprehendable" and who fled from federal officers. Ex. A at 4–5. Indeed, he was in Minnesota at all only because ICE had detailed him there on temporary duty for Operation Metro Surge. Divver Decl. ¶ 4. A federal court reviewing these same events has likewise described Officer Castro's conduct as occurring "in the course of his duties as an agent for United States Immigration and Customs Enforcement." *Walz*, slip op. at 1. And the day after the incident, ICE leadership directed his next movements, ordering him to return to Texas. *Id.* at 3 n.1; Divver Decl. ¶¶ 7, 9 (Officer Castro "had no discretion in this matter"). The struggle, the physical interference by Victim 1, the brooms wielded toward him, and the single shot all took place in the roughly fourteen seconds after he caught up to the fleeing subject. The charged conduct arose directly and entirely from his federal role. Nothing more is required. *See Soper*, 270 U.S. at 33.

Section 1442(c) reinforces the point. It provides that, "[s]olely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer —

> (1) protected an individual in the presence of the officer from a crime of violence;
>
> (2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or
>
> (3) prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury."

28 U.S.C. § 1442(c). Crediting Officer Castro's theory of the case, as the Court must, *Acker*, 527 U.S. at 432, the charged conduct occurred in the seconds after two men had forcibly separated a suspect from a lone federal officer mid-arrest while at least one of them wielded a broom toward him — conduct constituting a forcible assault on, and interference with, a federal officer under 18 U.S.C. § 111(a) — and as those men retreated into a residence where the officer could not see what they were doing or what they might retrieve.

The same nexus supports removal of Count V. Although the State labels that count a "false report," the conduct it charges was part of the federal enforcement action and the federal investigation that followed — not a private act committed after Officer Castro's federal role had ended. Four features of the Complaint make this clear.

*First*, the charged statements were necessarily made to federal officers. Count V charges that Officer Castro "informed a law enforcement officer that a crime had been committed, or otherwise provided information to an on-duty peace officer regarding the conduct of others." Ex. A at 2; *see* Minn. Stat. § 609.505, subd. 1. The only law enforcement officers to whom the Complaint attributes any statement by Officer Castro are federal: ICE Agent 1, a member of his own enforcement team, and the FBI agents who investigated the encounter. Ex. A at 4, 6–7. The BCA never interviewed him. *Id.* at 4. Whatever statement the State relies on, it was made by a federal officer, to federal officers, about a federal enforcement action.

*Second*, the earliest of those statements was made while the enforcement action was still under way. The Complaint dates Count V to January 14, 2026 — the night of the encounter, two days before the FBI affidavit was sworn. Ex. A at 2, 6. Within seconds of the discharge, Officer Castro "stepped back and spoke to an arriving ICE agent." *Id.* at 3. At that moment, the subject of the arrest had not been taken into custody; he and the man who had pulled him away from Officer Castro had retreated behind a closed door with other occupants; and backup officers were arriving on a scene they had not witnessed. Officer Castro briefed them on what had just happened, including that the occupants "had already shut the doors on us." *Id.* at 4. ICE officers then breached the residence and completed the arrests. *Id.* Briefing arriving officers on the threat posed by subjects who have just resisted arrest and barricaded themselves is not something an officer does after his duties end; it is part of performing them, and part of completing the very arrest that brought Officer Castro to 24th Avenue North.

*Third*, Officer Castro's statements to the FBI were made in the federal investigation of that same enforcement action — an investigation that encompassed both an on-duty federal use of force and the assault on a federal officer that Officer Castro reported. Ex. A at 4, 6–7. Federal officers are required to report uses of force, including any firearm discharge, and to cooperate in the resulting investigation. Uses of force during Operation Metro Surge were reported up the ICE chain of command: the operation's Director of Operations received notice of Officer Castro's use of force the next day, conferred with ERO senior leadership, and acted on it. Divver Decl. ¶¶ 6–7. The FBI affidavit identified Officer Castro not by name but by his official designation, "ERO #1." Ex. A at 6. And the United States relied on his account to charge Victims 1 and 2 in this Court with federal felony assault, *id.* at 7 — charges that, under 18 U.S.C. § 111(a)(1), presuppose that the officer was assaulted "while engaged in or on account of the performance of official duties."

*Fourth*, the State's own theory confirms the federal nexus. Count V requires that Officer Castro have "intended that the officer act in reliance upon" the information. Ex. A at 2. The only reliance the State can contend he intended is reliance by federal officers exercising federal authority — whether in responding at the scene or in the federal arrest and prosecution of persons who had interfered with a federal immigration arrest. *Id.* at 4, 7. The State thus seeks to punish a federal officer for the content of reports made through federal channels, to federal officers, about an offense against federal law committed against him in the course of a federal arrest. Officer Castro had no connection to Victims 1 or 2, to the residence, or to the events he described other than through his federal duties.

*Cf. Willingham*, 395 U.S. at 409 (removal proper where defendants' "relationship to [plaintiff] derived solely from their official duties"). Whatever the State contends about the accuracy of those reports, a prosecution for making them is, at a minimum, a prosecution "for or relating to" an act under color of office. 28 U.S.C. § 1442(a)(1).

Moreover, § 1442(a) authorizes removal of the "criminal prosecution" as a whole, and every count in this Complaint arises from the same federal enforcement action.

**3. Officer Castro Has a Colorable Federal Defense**

Third, Officer Castro has a colorable federal defense. He intends to assert federal immunity under the Supremacy Clause of the United States Constitution, among the other defenses cited above. Under *In re Neagle*, 135 U.S. 1 (1890), a state court has no jurisdiction if "(1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988); *see also New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Texas v. Kleinert*, 855 F.3d 305, 314–15 (5th Cir. 2017); *Wyoming v. Livingston*, 443 F.3d 1211, 1221–22 (10th Cir. 2006).

> "The inquiry on the motion to remand is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue. A merely "colorable" defense is sufficient to "assure the federal court that it has jurisdiction to adjudicate the case."

*Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (quoting *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006)). Section 1442(a)(1) does not require a

court to hold that a defense will be successful before removal is appropriate. *Acker*, 527 U.S. at 431.

**a. Officer Castro Acted Within the Course and Scope of His Authority**

Officer Castro intends to prove that he was acting within the scope of his federal authority when the charged incident occurred. Congress authorized him to stop and question persons believed to be aliens regarding their right to be in the United States, and to arrest without a warrant an alien whom he has reason to believe is present in violation of law and likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(1)–(2). A subject who has just fled a vehicle stop by federal officers and led them on a pursuit through city streets is, by definition, likely to escape. When Victim 2 physically resisted, and Victim 1 forcibly intervened to pull him away, each committed a federal offense in Officer Castro's presence, 18 U.S.C. § 111(a), for which Officer Castro was independently authorized to make an arrest. 8 U.S.C. § 1357(a)(5)(A). And Officer Castro was authorized to carry his service weapon and to use force, including deadly force, in accordance with federal standards. 8 C.F.R. §§ 287.5(f), 287.8(a). The colorable-defense standard does not require the officer to prove that his actions were in fact authorized — only that it is plausible that they were. Pursuing, apprehending, and defending himself against persons physically resisting a federal arrest plainly falls within the scope of authority possessed by a federal immigration officer.

**b. Officer Castro's Actions Were Necessary and Proper**

"For a federal employee to be stripped of the Supremacy Clause immunity it must be shown that the employee employed means which he cannot honestly consider reasonable in discharging his duties or that the act was made out of malice or with criminal intent." *California v. Dotson*, No. 12CR0917 AJB, 2012 WL 1904467, at *3 (S.D. Cal. May 25, 2012) (citing *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977)). To be necessary and proper, an officer must (1) subjectively believe that his action is justified, and (2) that belief must be objectively reasonable. *Clifton*, 549 F.2d at 728; *Tanella*, 374 F.3d at 147; *Kleinert*, 855 F.3d at 315. Critically, a defendant need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton*, 549 F.2d at 728.

> In making this determination—i.e., analyzing whether the agent's actions were "necessary and proper"—the focus "must rest not only on the subjective belief of the officer but also on the objective finding that his conduct may be said to be reasonable under the existing circumstances. Proper application of this standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be."

*Oregon v. Landis*, 761 F. Supp. 3d 1349, 1352 (D. Or. 2025) (quoting *Clifton*, 549 F.2d at 728), aff'd, No. 25-447, 2025 WL 3553731 (9th Cir. Dec. 11, 2025).

Both conditions are colorably met here, on the State's own evidence. Officer Castro was confronted with the following circumstances: (1) the subject of a federal immigration stop had fled from ICE officers by car and then on foot; (2) the subject had alerted the occupants of the residence while fleeing, and those occupants had called 911 and were waiting at the door for him, Ex. A at 4–5; (3) moments before Officer Castro

arrived, a man had been standing on the front lawn holding a snow shovel, *id.* at 3; (4) Officer Castro was alone, after dark, on icy ground, with his backup still arriving some 100 feet away, *id.*; (5) the subject physically resisted on the ground, and a second man then intervened to pull the subject away from Officer Castro, *id.* at 3, 5; (6) by their own admissions, one man "swung a broom at the agent" and the other "held the broom briefly like a baseball bat facing the agent," *id.* at 5; and (7) both men then retreated into a residence whose occupants and contents were unknown to Officer Castro. The entire encounter — from the moment he reached the subject to the single shot — lasted approximately fourteen seconds. *Id.* at 3.

The objective reasonableness of an officer's response must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Courts applying Supremacy Clause immunity have recognized that a federal officer who uses force during a rapidly evolving struggle with a fleeing suspect may be immune even where, in hindsight, the suspect proves to have been unarmed. *See Tanella*, 374 F.3d at 143–44, 151–52 (DEA agent who shot fleeing suspect during foot pursuit and struggle entitled to immunity); *Kleinert*, 855 F.3d at 317–20 (task-force officer whose weapon discharged while subduing fleeing suspect entitled to immunity). At a minimum, whether Officer Castro honestly and reasonably believed his actions were necessary in those fourteen seconds is a question on which his federal defense is plainly colorable, and it is precisely the kind of question §

1455(b)(5) commits to an evidentiary hearing in this Court. *See Long*, 837 F.2d at 752 (court "has a duty to make a prompt ruling" on Supremacy Clause immunity, and the State "cannot overcome that defense merely by way of allegations" but must make "an evidentiary showing sufficient at least to raise a genuine factual issue").

Nor does the State's theory of Count V defeat removal. Officer Castro's federal defense reaches Count V as well. Reporting an on-duty use of force and an assault on himself — to fellow officers during the operation and to federal investigators afterward — is conduct federal law authorizes, and indeed requires, a federal officer to undertake. *See supra* Part I.B.2. Whether in doing so he did "no more than what was necessary and proper," *Long*, 837 F.2d at 744, turns on whether he honestly and reasonably believed the account he gave — the same subjective-and-objective inquiry that governs the rest of his defense, *Clifton*, 549 F.2d at 728, and a question for this Court at the evidentiary hearing. Even "the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (citing *Neagle*, 135 U.S. 1).

The State will presumably argue that Officer Castro's account is inconsistent with the video and therefore evidences bad faith. But at this stage the Court must credit the officer's theory of the case, *Acker*, 527 U.S. at 432, and disputes about what happened are for the evidentiary hearing and, if necessary, trial — not grounds for summary remand. *Willingham*, 395 U.S. at 407–09. A false-report charge is, by its nature, a dispute about what happened. If a State could defeat removal merely by alleging that a federal officer's

official account of an on-duty encounter was false, it could keep any prosecution of a federal officer in state court simply by appending such a count. And the fixed city camera on which the State relies did not capture the entire encounter — Victims 1 and 2 were out of its view from 6:49:06 PM, Ex. A at 3 — let alone what Officer Castro perceived during a fourteen-second struggle on icy ground after dark, or what he believed when he described it moments later. Moreover, Officer Castro's federal defense to Counts I–IV does not depend on his own account; it rests on the State's own video evidence and the admissions of the State's own witnesses. The Complaint alleges no motive for any charged conduct apart from the performance of Officer Castro's federal duties.

## II. THIS CASE IS DISTINGUISHABLE FROM CASES DENYING REMOVAL OR IMMUNITY

The State may rely on *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), and *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), to argue that removal is improper. Those cases are distinguishable in critical respects. Both involved military convoy drivers involved in traffic accidents, with no duty-related exigency requiring their specific conduct. In *Ivory*, the Marine was returning from a routine transport with no emergency and no order prohibiting him from stopping to yield the right of way. *Ivory*, 906 F.2d at 1003. In *Cisneros*, the alleged exigency — brake failure — was not "the type which inheres in the very nature and object of the federal duty at issue." *Cisneros*, 947 F.2d at 1140.

Here, by contrast, the exigency is the federal duty itself. Officer Castro did not happen to be on duty when an unrelated accident occurred; he was in the act of

apprehending a fleeing subject under federal immigration law when he was physically resisted and interfered with, and every charged act occurred within seconds of that resistance or consisted of reporting it to fellow federal officers. Apprehending persons who flee and resist is not incidental to an immigration officer's duties — it is the "very nature and object" of them. *Id.*

This case aligns instead with *Tanella* and *Kleinert*, where federal officers pursuing fleeing suspects used force during a rapidly evolving physical encounter and were held entitled to Supremacy Clause immunity. *Tanella*, 374 F.3d at 151–52; *Kleinert*, 855 F.3d at 317–20. Here, as in those cases, there is a direct and meaningful connection between the charged conduct and the officer's federal law enforcement duties — not merely the coincidence of being on duty. The law enforcement urgency is not background context; it was the direct cause of the conduct now charged.

Officer Castro denies the charges and reserves the right to dispute the allegations against him, and asserts that at all relevant times he was acting as a federal officer, under color of his office, and that he has a colorable federal defense to the charges against him as set out above. Officer Castro further denies that the Minnesota statutes apply to the facts and circumstances of the alleged conduct and denies that his conduct was unlawful. Regardless of the lack of underlying merit to the State's allegations, Officer Castro was acting as a federal officer. He asserts a federal defense to prosecution for his conduct as a federal agent. The State seeks to prosecute Officer Castro with respect to conduct carried out during the discharge of his duties as a federal officer. Because Officer Castro was acting as a federal officer and under the direction of federal officers, and because he is

asserting a colorable federal defense to the State's prosecution, he has properly removed this case to this Court under Section 1442(a)(1). Pursuant to 28 U.S.C. § 1455(b)(2), this Notice states all grounds for removal presently known to Defendant; Defendant reserves the right to seek leave to supplement those grounds for good cause shown. Accordingly, Officer Castro has the right to have this case heard in federal court.

## CONCLUSION

Because it does not clearly appear on the face of this Notice and its exhibits that removal should not be permitted, Defendant requests that the Court accept jurisdiction over this matter, proceed under 28 U.S.C. § 1455(b)(5), and promptly set an evidentiary hearing to make such disposition of the prosecution as justice shall require. Section 1455(b)(4) directs the Court to summarily remand only if it "clearly appears" that removal should not be permitted; otherwise, § 1455(b)(5) requires an evidentiary hearing. Under § 1455(b)(3), no judgment of conviction may be entered in the State court unless and until this prosecution is first remanded.

Promptly after filing this Notice, Defendant will serve all adverse parties and file a copy of this Notice with the Clerk of the Hennepin County District Court, Fourth Judicial District. Proof of such service and filing will be lodged with this Court.

Date: October 16, 2026.

Respectfully submitted,

By: */s/ Michael J. Wynne**
Michael J. Wynne
TX Bar No. 00785289
Federal Bar No. 0018569
Jon Muschenheim*
TX Bar No. 14741650
Federal Bar No. 0009246
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
Telephone: (281) 450-7403
mwynne@gwafirm.com
jmuschenheim@gwafirm.com

GERDTS LAW PLLC

s/ Daniel L. Gerdts

Daniel L. Gerdts
No. 207329
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
612.800.5086
daniel@danielgerdtslaw.com

*Attorneys for Christian J. Castro*

**Admitted Pro Hac Vice*